IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JUSTIN WAYNE BEEBE,

    Petitioner,               No. 2:12-cv-0155 LKK KJN P

    vs.

F. CHAVEZ,

    Respondent.          FINDINGS AND RECOMMENDATIONS

                              /

I. Introduction

        Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2009 conviction for torture, and the indeterminate sentence of life in prison with the possibility of parole. Petitioner claims there was insufficient evidence to support the torture conviction, in violation of his constitutional rights.  After careful review of the record, this court concludes that the petition should be denied.

II. Procedural History

        On July 28, 2009, a jury found petitioner guilty of torture, corporal injury to a child, false imprisonment, criminal threats, corporal injury to a cohabitant or parent of child, and child abuse or endangerment. (Respondent's Lodged Document ("LD") 7, Vol. 2, at 362-63.)

1

The jury also found true the allegation that petitioner personally inflicted great bodily injury.  (Id. at 363.)  Petitioner was sentenced to a determinate term of three years eight months, and an indeterminate term of life in prison with the possibility of parole.  (LD 7, Vol. 3, at 608-10.)

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District.  The Court of Appeal affirmed the judgment on September 24, 2010.  (LD 4.)

Petitioner filed a petition for review in the California Supreme Court.  (LD 5.)  The California Supreme Court denied review on December 21, 2010.  (LD 6.)

Petitioner filed the instant petition on January 20, 2012.  (Dkt. No. 1.)

III.  Facts[1]

The opinion of the California Court of Appeal contains the following factual summary of petitioner's offenses.

> Clara testified both she and [petitioner] were 21 and their daughter, Bryanna, FN2 was born in May 2008.  [Petitioner's] mother helped with child care, but did not stay overnight.  [Petitioner] worked the night shift, and he would arrive home about 7:00 a.m.
>
>> FN2. We here use baby Bryanna's first name to lend human dignity to her suffering and to humanize this opinion in which her grievous wounds are described and addressed in what to lay people must seem detached legalese.  Use of initials impairs readability and comprehension, diminishes, if not, eliminates practical citation of case names, and leads to confusion for anyone who reads this opinion, especially legal researchers.  It also impairs record-keeping.  (Keith R. v. Superior Court (2009) 174 Cal.App.4th 1047, 1051, fn. 2; In re Branden O. (2009) 174 Cal.App.4th 637, 639, fn. 2; In re Edward S. (2009) 173 Cal.App.4th 387, 392, fn. 1; Cal. Rules of Court, rule 8.401(a)(2).)
>
> [Petitioner] was an alcoholic. He would sometimes try to quit, only to relapse, and the couple would fight about his drinking.  On May 11, 2007, Clara tried to take car keys away from defendant

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Beebe, No. C063176 (September 24, 2010), a copy of which was lodged by Respondent as Lodged Document ("LD") 4 on June 25, 2012.

when he was drunk, and he scratched her face with them. Clara obtained a restraining order and separated from [petitioner] for three months, but then returned to him because she loved him. On a later occasion the police took [petitioner] away because of the restraining order.

Clara testified that the couple thought having a baby "was going to make him change." They did not fight after the baby was born, but Clara left [petitioner] for a week during that period, because of his drinking.

Clara returned to work on August 11, 2008, and the plan was for her sister to take care of Bryanna while Clara was at work. However, her sister suggested it was time for [petitioner] to take responsibility for child care. [Petitioner] agreed to watch Bryanna, so Clara left the baby in [petitioner's] care, and about 11:30 a.m. Clara arrived at work.

Although Clara testified she had no concerns about the baby's safety, she told [petitioner] she would call to make sure he did not fall asleep. She also told him that if anything happened to her baby, she would leave him. She tried to reach [petitioner] by telephone from work five or six times, beginning around 12:30 p.m., but did not reach him until about 2:00 p.m. They argued, and she could hear the baby crying in the background. [Petitioner] sounded drunk, and said he had no patience and he could not get the baby to stop crying. After [petitioner] hung up, Clara called back and [petitioner] seemed normal, allaying her concerns.

Clara admitted that in her grand jury testimony, she told [petitioner] during the first call that she was going to have the "cops" or her brother check on the baby.

Clara left work early and returned home about 4:00 p.m. to find [petitioner] asleep on a couch with a beer in his hand, and the baby in a swing. When Clara saw that the baby had a bruised face, she woke [petitioner] and asked what happened. [Petitioner] said, "I didn't do anything. I don't know what you're talking about." Clara became upset and began hitting [petitioner] to get him to tell her what happened. He was drunk. He pushed her against a wall and bit her nose, causing it to bleed. He hit her in the face and grabbed her neck.

Eventually, [petitioner] said that he had dropped the baby and then said she banged her head as he was taking her out of the crib. Clara checked the baby and saw a sore near her genitals, and when she asked, [petitioner] said he had wiped the baby too hard. Clara wanted to take the baby to the hospital immediately, but [petitioner] refused to go because he was drunk, and he wanted his mother to go. Eventually, about 5:00 p.m., Clara took the baby to [petitioner's] mother's house.

3

[Petitioner's] mother was afraid to go to the hospital after she saw the baby's injuries, so Clara's sister accompanied Clara and the baby to the Lodi Memorial Hospital emergency room. After hospital personnel told her the baby had a 50/50 chance of survival, the baby was flown to the UC Davis Medical Center.

Clara told the police that [petitioner] threatened to kill her and the baby, but testified that she lied "[b]ecause [she] wanted him to pay for what he did." Clara testified she also lied to hospital staff when she said [petitioner] prevented her from taking the baby to the hospital. However, Clara's sister testified that when Clara got into the car, she asked Clara why she had not obtained help for Bryanna sooner, and Clara, still upset, said [petitioner] had hit her and forcibly prevented her from leaving.

Clara had not returned the prosecutor's calls, but had met with defense counsel for a couple of hours the night before her testimony -- not their first meeting -- along with [petitioner's] mother, with whom Clara regularly stays. Clara testified she still loves [petitioner].

Detective Stephen Maynard recorded an interview with Clara, and the parties stipulated the transcript was accurate. Clara said that when she saw Bryanna's vaginal injuries, she began "freaking out" because she thought [petitioner] may have "raped her or something." She began crying and yelling for help, but nobody helped her, and she concluded, "[Y]ou know what, I'm not gonna get away. I'm not." "So then I decided to tell him I loved him. And everything was gonna be okay. I was just gonna take the baby to the hospital. And that he needed to let me go so I can come back to him. 'If you would let me go' -- Because he said, 'If you leave me, I'm gonna kill you, my baby, and your family.' "

Clara also told the detective that [petitioner] would get frustrated when the baby cried, but the baby would stop crying when he gave the baby to her to hold. Once, not long before the charged incident, [petitioner] put the baby in the swing roughly, and when Clara told him she would leave him if he treated the baby like that, [petitioner] said he would kill her and her family. [Petitioner] often beat her, including when she was pregnant, but she never reported it because she was afraid he would kill her and her family.

Detective Maynard observed Clara's trial testimony, and believed she recited things, such as using the word "alcoholic" which she had never used with the officer before, and that "she's a classic domestic violence victim that retracts her story after the fact."

Detective Maynard testified he interviewed [petitioner], and recordings of the interview were played for the jury. In Detective Maynard's opinion, [petitioner's] tears during the interview were fake. [Petitioner] told the detective he left the baby alone to visit

4

his upstairs neighbor, and also to go to the video store and market. However, the neighbor testified [petitioner] did not come to his apartment that day, the video store reported [petitioner] had rented two movies with Clara earlier than he had said, and Detective Maynard watched the security video at the market, and [petitioner] was never there.

Dr. Kevin Coulter, a specialist in pediatric child abuse, testified that he examined Bryanna on August 12, 2008. She had bruising around both eyes, her forehead, the left side of her face and scalp, left ear lobe, upper chest, abdomen, genital area and between her thighs. These injuries were likely caused by slaps, either with a hand or an object. A scan showed that Bryanna had bleeding between her brain and skull on both sides, with subdural bleeding in the back and subarachnoid bleeding in the front, indicating multiple impacts "with significant force in order to cause that to happen." Because the vaginal injuries consisted of "multiple areas" of bruising, "on both inner thighs and directly over the tissue that covers her genital structure," Dr. Coulter believed that more than one vaginal blow had been struck.

[Petitioner] testified that in addition to drinking beer, with which Clara "was okay," he would conceal vodka in water bottles so Clara would not know. Using this method, he drank at the rate of about a half-gallon of vodka every three days, apart from the beer that Clara saw him drink.

On the date in question, he began drinking as soon as he returned home from his night shift, about 7:30 to 8:00 a.m., which was his usual routine. He had no memory of how Bryanna was injured. He remembered Clara left for work about 10:30 or 11:00 a.m., and remembered telling Clara that he could watch Bryanna, after Clara's sister "bailed out on her." When asked what he next remembered, [petitioner] testified it was hard to remember, "I got a flash of bathing her, and I got a flash of feeding her, and I got a flash of the monitor in the kitchen, swing. I don't know."

On cross-examination, [petitioner] testified these flashes may have been memories from different days. When Clara woke him up and confronted him about Bryanna's injuries, he told her he had dropped the baby "[b]ecause it was the first thing that came to [his] mind." He also stated, "I think I said she fell off the bed, she fell off the swing and I was walking around and I bumped her head." But he did know if these things really happened. He remembered Clara calling him, but not the details of the call. He repeated that he had no memory of hurting Bryanna, and testified he would never intentionally hurt or torture her. He remembered hitting Clara in the face with an open hand as they fought. He denied preventing Clara from taking Bryanna to the hospital, but he refused to go with her because he was drunk. After she left, he continued drinking until he passed out. He testified he lied to the

5

police because, "I couldn't just say I don't know." He testified nobody else was in the apartment, but stated, "I'm not going to ever say I did [hurt Bryanna] because that's not right. I feel like I've been wrongfully accused, but I was the only one there."

[Petitioner] conceded that he must have struck Bryanna with an open hand several times, based on the bruises, but insisted Bryanna's vaginal injuries must have been from wiping too hard, not blows, despite the contrary medical testimony.

When the prosecutor asked [petitioner] why he had made up explanations for Bryanna's injuries, [petitioner] testified:

"A. What was I supposed to do, go, I don't know what happened?

Q. That's what you're doing here today so. . . .

A. I know that. What was I supposed to do, go, I don't know what happened?

Q. If that was the truth, I assume you would have told it.

A. Yeah, but. . . ."

On redirect, [petitioner] explained he did not tell the police he did not know what happened "[b]ecause it makes me look retarded." "[W]hen they were coming at me like that, I had to let them know something that had happened that would maybe look like that could have happened."

Defense witnesses, including family members, friends, and a defense psychologist who had examined [petitioner], testified to the effect that [petitioner] loved his daughter and would not intentionally hurt her.

Dr. Jacquelyn Keller, the defense psychologist, testified [petitioner] was abusive with Clara, in part based on sexist beliefs, and it would not be surprising that he would abuse a child, particularly when drunk. Parents sometimes abuse babies who cry, and [petitioner's] purpose in striking the baby was to release stress. She conceded [petitioner] struck Bryanna intentionally, and that sometimes when people act out violently, they may derive relief or satisfaction from doing so.

(People v. Beebe, slip op. at 2-9.)

IV. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the

1   United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the
2   interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);
3   Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief

7

so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at 784-85. That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court conducts an independent review of the record. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct. at 784. "[A] habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

V. Alleged Insufficient Evidence

    A.  The Parties' Claims

Petitioner claims that there was insufficient evidence to support the torture conviction, and that the state court's denial of this claim was an unreasonable application of the facts in light of the evidence presented. Petitioner contends that while there was evidence that petitioner caused injuries to his daughter, there was insufficient evidence that petitioner inflicted

the injuries with the necessary specific intent rising to the level of "torture," as defined under California law.  Petitioner argues that there was "no substantial" evidence to demonstrate he acted with a sadistic purpose, and that none of the other purposes set forth in the statute, i.e., revenge, extortion, or persuasion, apply.  (Dkt. No. 1 at 41.)  Petitioner concedes he acted out of "intense frustration and anger," but that there is no evidence that he took any pleasure out of injuring his daughter.  (Dkt. No. 1 at 10.)

Respondent contends that the evidence adduced at trial was sufficient because the evidence proved petitioner inflicted great bodily injury on the baby, and that he inflicted the injury with the intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose.  (Dkt. No. 11 at 19.)

### B.  Last Reasoned State Court Decision

The California Court of Appeal for the Third Appellate District rejected petitioner's claim in a reasoned decision on direct appeal:

*Evidence of Torture*

> [Petitioner] contends no substantial evidence supports the torture verdict, specifically, there is no substantial evidence of the necessary intent for torture.  We disagree.
>
> Section 206 provides in part: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture."  We have explained sadistic purpose as follows:
>
> "Sadistic purpose encompasses the common meaning, "'the infliction of pain on another person for the purpose of experiencing pleasure.'" [Citation.]["]  While sadistic pleasure is often sexual, the statute does not require a sexual element.  [Citation.]
>
> "Torture does not require the defendant act with premeditation and deliberation, and it does not require that he intend to inflict prolonged pain.  [Citation.]  Accordingly, the length of time over which the offense occurred is relevant but not necessarily determinative.  [Citation.]  Likewise, the severity of the wounds inflicted is relevant but not necessarily determinative.  [Citation.]" (People v. Massie (2006) 142 Cal.App.4th 365, 371.)

On appeal, [petitioner] states "the evidence shows a drunken young man's frustration and lack of experience dealing on his own with a crying infant in need of a diaper change." Conceding there were some injuries in the vaginal area, [petitioner] contends that his attack "unfortunately, was body-wide and not focused on any one particular area. And, the vaginal injuries are explained by [petitioner's] frustration at having to change 'a big poopy diaper' when he was drunk and wanted to watch movies." That would be a plausible argument for a jury. However, it does not show insufficient evidence.

Evidence of what a person is thinking "is almost inevitably circumstantial" (People v. Bloom (1989) 48 Cal.3d 1194, 1208), and "'courts and juries every day pass upon knowledge, belief and intent -- the state of men's minds -- having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.' [Citation.]" (United States v. Williams (2008) 553 U.S. 285, 306 [170 L.Ed.2d 650, 671]; see People v. Johnson (1901) 131 Cal. 511, 514.)

"The intent with which a person acts is rarely susceptible of direct proof and usually must be inferred from facts and circumstances surrounding the offense. [Citations.] In reviewing a jury's determination, we view the whole record in a light most favorable to the verdict, drawing all reasonable inferences and resolving all conflicts in support of the jury's verdict. [Citation.] We must uphold the verdict unless it clearly appears that upon no hypothesis whatever is there sufficient evidence to support it. [Citation.]" (People v. Massie, supra, 142 Cal.App.4th at p. 371.)

In particular, regarding torture, "'the circumstances of the offense can establish the intent to inflict extreme or severe pain.' [Citation.] For example, 'a jury may infer intent to cause extreme pain from a defendant who focuses his attack on a particularly vulnerable area, such as the face, rather than indiscriminately attacking the victim.' [Citation.]" (People v. Hamlin (2009) 170 Cal.App.4th 1412, 1426-1427; see People v. Quintero (2006) 135 Cal.App.4th 1152, 1163.)

[Petitioner] inflicted multiple, intentional blows, some in the baby's face and some in her vaginal area. The defense psychologist testified these blows may have been for [petitioner's] "stress relief." Clara left the house around 11:30 a.m., and did not return until about 4:00 p.m., from which the jury could conclude the abuse took place over a long time. The blows were not random: [Petitioner] struck at least two deliberate blows to the baby's face or head, and also struck her vagina, more than once. Although the baby suffered injuries to other parts of her body, the jury could rationally conclude that [petitioner] targeted the face and vagina to inflict pain, to keep the baby from crying and disturbing him, and thereby relieve his stress, or "to give pain to punish her for crying."

     (People v. Pensinger (1991) 52 Cal.3d 1210, 1239-1240 [torture murder case].)

    Thus, substantial evidence supports the torture verdict.

(People v. Beebe, slip op. at 9-12.)

### C. Legal Standards

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).

In conducting habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13. When a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011).

////

D. <u>Analysis</u>

California Penal Code § 206 provides:

> Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture.
>
> The crime of torture does not require any proof that the victim suffered pain.

Cal. Penal Code § 206. In Section 12022.7, "great bodily injury" is defined as "a significant or substantial physical injury." Cal. Penal Code § 12022.7. The jury was specifically instructed that in order to prove that petitioner committed torture, the prosecution must prove that petitioner "inflicted great bodily injury on someone else," and that "when inflicting the injury, [petitioner] intended to cause cruel or extreme pain and suffering for any sadistic purpose." (Clerk's Transcript at 431.) The jury was informed that "[s]omeone acts with a sadistic purpose if he intends to inflict pain on someone else in order to experience pleasure himself." (<u>Id.</u>)

"Torture focuses upon the mental state of the perpetrator." <u>People v. Massie</u>, 142 Cal. App. 4th 365, 371, 48 Cal. Rptr. 3d 304 (2006) (citation omitted). "Courts have interpreted intent to inflict 'cruel' pain and suffering as intent to inflict extreme or severe pain." <u>People v. Burton</u>, 143 Cal. App. 4th 447, 452, 49 Cal. Rptr. 3d 334 (2006). "Sadistic purpose encompasses the common meaning, 'the infliction of pain on another person for the purpose of experiencing pleasure. . . . While sadistic pleasure is often sexual, the statute does not require a sexual element." <u>Massie</u>, 142 Cal. App. 4th at 371 (internal citation omitted). "Absent direct evidence of . . . intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain." <u>Burton</u>, 143 Cal. App. 4th at 452.

> Torture does not require the defendant act with premeditation and deliberation, and it does not require that he intend to inflict prolonged pain. . . . Accordingly, the length of time over which the offense occurred is relevant but not necessarily determinative. . . . Likewise, the severity of the wounds inflicted is relevant but not necessarily determinative.

////

1  Massie, 142 Cal. App. 4th at 371 (citations omitted).  "Also, a jury may infer intent to cause
2  extreme pain from a defendant who focuses his attack on a particularly vulnerable area . . . rather
3  than indiscriminately attacking the victim."  Burton, 143 Cal. App. 4th at 452.
4              Here, the evidence presented was sufficient to satisfy the elements and convict
5  petitioner of torture.  The Court of Appeal rejected petitioner's argument that the evidence failed
6  to demonstrate that he committed torture.  In support of its decision, the Court of Appeal noted
7  that the circumstances of the event, including the injuries sustained by the two month old baby,
8  and the possible motive, supported the conviction of torture.  First, the baby suffered from
9  bruising around both eyes, her forehead, the left side of her face and scalp, left ear lobe, upper
10 chest, abdomen, genital area, and between her thighs.  Dr. Coulter testified that a scan revealed
11 the baby had bleeding between her brain and skull on both sides, with subdural bleeding in the
12 back, and subarachnoid bleeding in the front, indicating multiple impacts with significant force
13 in order to cause such bleeding.  (Reporter's Transcript ("RT") 318; 320-21.)  Second, the doctor
14 testified that the injuries were likely caused by slaps with a hand or an object.  (RT 312; 328.)
15 Dr. Coulter opined that the injuries could not have been sustained from rolling off the bed, or
16 falling from the baby swing.  (RT 321; 325.)  Dr. Coulter thought the injuries were more
17 equivalent to injuries an unrestrained infant might suffer in an auto accident.  (RT 322; 332.)
18 Third, on cross-examination, defense expert Dr. Keller testified that petitioner willfully struck
19 the baby (RT 470-71), and conceded that when people violently act out, they may derive relief or
20 satisfaction from doing so (RT 477).  Thus, it was not unreasonable for the state court to find that
21 the jury could conclude petitioner intentionally hit Bryanna to inflict pain, to keep her "from
22 crying and disturbing him, and thereby relieve his stress, or 'to give pain to punish her for
23 crying.'"  People v. Beebe, slip op. at 12.
24             Petitioner argues that the evidence fails to support the allegation that he acted with
25 a sadistic purpose, that he experienced pleasure by hitting the baby, or that the baby was
26 repeatedly struck over time rather than all in one chaotic attack.  Rather, petitioner contends that

"the evidence shows a drunken young man's frustration and lack of experience dealing on his own with a crying infant in need of a diaper change." (Dkt. No. 15 at 6.) Indeed, at trial, Dr. Keller testified that petitioner "has no memory so none of us know what his state of mind was at the time." (RT 482.)

However, in order to obtain federal habeas relief on this claim, petitioner must demonstrate that the state courts' denial of relief with respect to his insufficiency of the evidence arguments was an objectively unreasonable application of the decisions in Jackson and Winship to the facts of this case. Petitioner failed to overcome the deference due to the state court's findings of fact and its analysis of this claim. It is reasonable to infer that the trier of fact resolved any such potentially conflicting inferences in finding petitioner committed torture, based on the multiple and forceful impacts to the two-month-old baby's face and genital areas, which are particularly vulnerable areas, and the resulting bleeding in her brain and genital tissue. (RT 322; 328; 346.) The court must defer to that resolution. See Jackson, 443 U.S. at 326. "Absent direct evidence of such intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain." Burton, 143 Cal. App. 4th at 452. Thus, a jury could reasonably conclude from the totality of the injuries inflicted on the baby and the circumstances surrounding the offense that petitioner intended to cause, and caused, cruel or extreme pain to Bryanna.

While petitioner appears to argue that he indiscriminately hit the baby in one drunken, chaotic event, evidence was adduced at trial that petitioner administered multiple blows, which could have been administered throughout the time petitioner was in charge of the baby from 11:30 a.m. to around 4:00 p.m. But in any event, "[a]lthough a prolonged attack may be circumstantial evidence of an intent to cause cruel or extreme pain, neither the intent to cause nor the actual causing of prolonged pain is a requirement of torture as defined in section 206." People v. Aguilar, 58 Cal. App. 4th 1196, 1204-05, 68 Cal. Rptr. 2d 619 (1997). Neither the brevity of an attack nor the absence of a premeditated intent to torture precludes a finding of the requisite intent. Hale, 75 Cal. App. 4th at 107; Aguilar, 58 Cal. App. 4th at 1207.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the crime of torture was committed. See Jackson, 443 U.S. at 319. Thus, the decision of the state appellate court is not contrary to, or an unreasonable application of, clearly established federal law, and is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington,131 S. Ct. at 786-87. Accordingly, petitioner is not entitled to federal habeas relief.

VI.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 18, 2012

KENDALL J. NEWMAN  
UNITED STATES MAGISTRATE JUDGE

/beeb0155.157